# In the United States Court of Federal Claims

No. 17-1982C

(Filed Under Seal:  March 9, 2018)

(Reissued:  March 14, 2018)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| **SKC, LLC,** ) | Protest of a sole-source procurement |
| ) | under SBA's Section 8(a) Program; 15 |
| **Plaintiff,** ) | U.S.C. §§ 631-37, 644; 13 C.F.R. §§ |
| ) | 124.1 to 124.704; exception to full and |
| **v.** ) | open competition; absence of clear |
| ) | intent to award the contract as a |
| **UNITED STATES,** ) | competitive small business set aside; 13 |
| ) | C.F.R. § 124.504(a); "new" |
| **Defendant** ) | requirement; 13 C.F.R. § |
| ) | 124.504(e)(1)(ii)(c) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Devon E. Hewitt, Protorae Law, PLLC, Tysons, Virginia, for plaintiff.  Of counsel were Kandis M. Koustenis, Ben M. Kacher, and Bret C. Marfut, Protorae Law, PLLC, Tysons, Virginia.

Devin A. Wolak, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Chad A. Readler, Acting Assistant Attorney General, Civil Division, Robert E. Kirschman, Jr., Director, and Douglas K. Mickle, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER[1]

LETTOW, Judge.

This bid protest arises out of a disputed procurement process whereby the Defense Intelligence Agency ("DIA") awarded a contract for logistical services on a sole-source basis through the Small Business Administration's ("SBA") Section 8(a) Program.  This logistical services requirement had been performed by plaintiff, SKC, LLC, under a one-year base contract with four one-year option periods, which extended from 2011 to 2016.  Following the expiration of the base contract, SKC was awarded a second contract, denominated the Bridge Contract, which consisted of another one-year base term and a single one-year option period.  DIA declined to exercise the option, and began preparations to replace the Bridge Contract with a new

---

[1]Because of the protective order entered in this case, this opinion was initially filed under seal.  The parties were requested to review this decision and provide proposed redactions of any confidential or proprietary information.  No redactions were requested.

procurement.  DIA solicited SBA's advice on whether this procurement would be a viable candidate for the Section 8(a) Program, a sole-source procurement process by which agencies may dispense with some of the requirements of federal acquisition regulations in certain limited circumstances.  After two draft proposals, the SBA accepted DIA's logistics requirement into the Section 8(a) Program, and DIA awarded the contract to Ikun, LLC.  SKC protested this procurement award before the Government Accountability Office ("GAO"), and when that proved unavailing, filed the instant protest in this court.

SKC alleges that irregularities in the procurement process culminating in the award to Ikun violated the SBA's implementing regulations for the Section 8(a) Program on dual grounds.  First, the SBA never performed an adverse impact analysis when determining to accept DIA's proposed procurement into the Section 8(a) Program and the proposed procurement did not qualify for an exemption from that process.  Second, DIA publicly stated an intention to award the logistics contract following competition as a small business set-aside, and thus the procurement could not be accepted into the Section 8(a) Program.

The parties have fully briefed their positions, and a hearing on their motions for judgment on the administrative record was held on February 21, 2018.

## FACTS[2]

### A.    The Contracts

In 2011, SKC was awarded contract HHM402-11-C-0049 to provide DIA with, *inter alia*, "warehousing services, for general supplies, property and equipment within the National Capital Region."  AR 1.3-204, -247;[3] *see also* Pl.'s Mem. of Law in Support of SKC, LLC's Mot. for Judgment on the Administrative Record ("Pl.'s Mem.") at 4-5, ECF No. 26.[4]  The contract, which was issued through a "small business set-aside[] competitive procurement," *see* Pl.'s Mem. at 4-5 (citing AR 4.18-1505), contemplated a one-year base period, with four options held by the government to extend the contract for additional one-year periods, *see* AR 1.3-276; Pl.'s Mem. at 4; Def.'s Cross-Mot. for Judgment on the Administrative Record and Resp. to Pl.'s Mot. for Judgment on the Administrative Record ("Def.'s Cross-Mot.") at 4, ECF No. 29.  The

---

[2]The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement filed pursuant to Rule 52.1(a) of the Rules of the Court of Federal Claims ("RCFC").  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (explaining that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

[3]The administrative record is divided into tabs and paginated sequentially.  In citing to the record, the court will first designate the tab, followed by the page number.  *E.g.*, AR 1.3-247 refers to tab 1.3, page 247 of the administrative record.

[4]SKC initially filed its motion for judgment on the administrative record under seal on January 19, 2018, and later filed a redacted version on February 1, 2018.  All citations to SKC's motion will be to the redacted version.

government exercised all four options, and SKC performed under this contract until 2016.  Pl.'s Mem. at 4; Def.'s Cross-Mot. at 4 (citing AR 1.4-773, -1000, -1005, -1030).

Following the expiration of the final option year, SKC was awarded contract HHM402-16-C-0101 (the "Bridge Contract") on a single-source basis to continue providing the logistics services with a base term of one year and an option for a one-year extension because "[t]he [g]overnment [was] anticipating a change in the current acquisition strategy for warehouse services . . . [and the bridge contract was being awarded in the interim] to ensure that ongoing warehouse projects and services proceed without any potential for break in service."  AR 4.1-1414 (e-mail from Contracting Officer to SKC official (Aug. 23, 2016)); AR 1.2-80 (the executed Bridge Contract).  The base term of the Bridge Contract began on September 26, 2016 and ended on September 24, 2017.  AR 1.2-86.  After the base period of the Bridge Contract had run, DIA awarded SKC a short-term bridge contract to ensure the continuity of logistics services pending the resolution of SKC's protest before the GAO.  See Hr'g Tr. 8:5-17 (Feb. 21, 2018);[5] see also Compl. ¶ 11 (noting that the short-term bridge contract had an initial term running from September 25, 2017 to November 24, 2017, and an option term from November 25, 2017 to January 24, 2018); Hr'g Tr. 5:8 to 6:4 (Dec. 21, 2017) (noting that DIA intended to exercise an option term in the short-term bridge contract to extend performance from January 25, 2018 to March 24, 2018).  Performance under the Section 8(a) contract awarded to Ikun has been stayed since the initiation of SKC's protest before the GAO.  See AR 4.1-1406.

During the pendency of the Bridge Contract, the contracting officer retired, and her replacement notified SKC that the Bridge Contract's option would not be exercised.  Def.'s Cross-Mot. at 5 (citing AR 1.5-1057, 4.5-1445).  The new contracting officer stated that the Bridge Contract's option term was not exercised, in part, because the previous contracting officer had not completed a "Justification and Approval, which is required for contracts awarded as an exception to competition."  Def.'s Cross-Mot. App., at A2 (Decl. of Gregory Hall (Feb. 5, 2018)).

During the pendency of the Bridge Contract's base period, the contracting officer began exploring the possibility of a sole-source award of the logistics requirement under the SBA's Section 8(a) Program.  See, e.g., AR 4.5-1445.  DIA submitted a proposal to SBA for accepting the logistics requirement into the Section 8(a) Program on May 22, 2017, and described it as "follow-on work" from the 2011 base contract.  Def.'s Cross-Mot. at 6 (citing AR 3.1-1170 to -1171).  The SBA requested additional information on the proposed procurement and SKC's current performance of it to evaluate whether it met the requirements of the Section 8(a) Program and whether further procedural requirements applied.  AR 4.5-1445; see also Pl.'s Mem. at 6-7 (The SBA "requested additional information regarding the SKC Bridge Contract[; i]n particular . . . whether SKC was a small business, . . . [and] if so, . . . [whether] an 'adverse impact' study [was required] before accepting the follow-on logistics services requirement for the Section 8(a) Program.").

---

[5]The date will be omitted from further references to the transcript of the hearing conducted on February 21, 2018.

After DIA provided the requested information, personnel from the SBA and DIA conferred via teleconference regarding the proposed Section 8(a) award. *See* Def.'s Cross-Mot. at 6 (citing AR 3.2-1216); Hr'g Tr. 11:4-22. No contemporaneous notes or records of that call are available. *See* Pl.'s Mem. at 7 ("The contract file does not include any contemporaneous evidence of this call or the supposed conclusions [DIA] reached as a result."). Some commentary about the conference is set out in a *post hoc* "statement [by the contracting officer] that was submitted in the GAO protest," Hr'g Tr. 11:25 to 12:1, and in the briefing by government's counsel, *see* Def.'s Cross-Mot. at 6 ("During that call, personnel at both agencies discussed the scope and price of the [logistics] requirement as it existed under the 2011 contract, the [Bridge Contract], and the potential sole-source 8(a) contract . . . . [and] it was determined that the [logistics] requirement was 'new' under [the governing regulations.]"). Following this call, DIA submitted a revised proposal for awarding the logistics contract under the Section 8(a) Program, omitting DIA's "acquisition history for the follow-on logistics services requirement and any reference to SKC." Pl.'s Mem. at 7; *see also* Def.'s Cross-Mot. at 6 ("On June 2, 2017, DIA sent a revised offer letter[,] . . . this time changing the prospective value of the requirement to reflect the independent government cost estimate.") (citing AR 3.3-1222). SBA formally accepted the logistics requirement into the Section 8(a) Program on June 5, 2017, *see* AR 3.5-1271 to -1275, and contract HHM 402-17-C-0069 was awarded to Ikun, a Section 8(a) Program participant, *see* Pl.'s Mem. at 8; AR 4.5-1446.[6] No adverse impact analysis was ever performed. *See* Pl.'s Mem. at 2 ("None of the parties participating in the protest [before the GAO] disputed the fact that the SBA never performed the analysis necessary to determine whether [DIA's] award of the follow-on logistics services contract would have an 'adverse impact' on a small business."); *cf.* Def.'s Cross-Mot. at 6-7.

## B.   The Industry Days

Prior to and after the acceptance of the logistics requirement into the Section 8(a) Program, DIA included the logistics requirement in materials distributed at several industry day events open to industry contractors and interested parties. *See* Def.'s Cross-Mot. at 8-9 (citing AR 2.1-1060 to -1092; AR 2.2-1093 to -1130). The first industry day was held on February 14, 2017, and "[n]otification of the industry day was published on the Federal Business Opportunities website." Pl.'s Mem. at 5 (citing AR 4.5-1444). At that event, the logistics requirement "was included on DIA's 'Business Opportunity Forecast,' and the 'competition type' was designated 'Small Business Set-Aside.'" Def.'s Cross-Mot. at 8 (citing AR 2.1-1074). The forecast document began with a disclaimer that "[t]his event is for informational purposes only. The information being provided is to help [i]ndustry understand the [g]overnment's objectives of improving proposals and the proposal process. The information being presented may change prior to release of a solicitation." AR 2.1-1067. Similar caveats were included in the presentation that accompanied the forecast documents. *See* AR 2.1-1078, -1083, -1084.

---

[6]Ikun, LLC is owned by Akima, LLC, an Alaska Native Corporation. *See* Pl.'s Mem. at 6; AR 4.1-1406.

At an initial conference held on December 21, 2017, counsel for the government represented that Ikun had been notified of the instant proceedings but had opted not to participate in them. Hr'g Tr. 9:24-10:6 (Dec. 21, 2017).

DIA held a second industry day on June 16, 2017, eleven days after SBA had accepted the logistics requirement into the Section 8(a) Program, and the logistics requirement was again listed on the contracting forecast document as a small business set-aside with SKC as the incumbent. AR 2.2-1095, -1122.[7]  The presentation documents did not contain disclaimers of the type given in the first industry day, *see generally* AR 2.2-1095 to -1124, but the presenters gave oral statements that "the information presented during the industry days was tentative and subject to change," Def.'s Cross-Mot. at 9 (citing AR 4.3-1440); *see also* Hr'g Tr. 41:4-12.  No representatives of SKC attended the second industry day, but after the event, SKC requested and received the materials given to attendees. *See* Def.'s Cross-Mot. at 9 (citing AR 2.3-1131, 2.4-1140).

## C.    The GAO Protest

After learning of the Section 8(a) award to Ikun, SKC filed a bid protest with GAO on August 24, 2017. Pl.'s Mem. at 8 (citing AR 4.1-1405).  In it, SKC alleged that the award of a contract for logistics services under the Section 8(a) Program violated the Federal Acquisition Regulations because DIA had "expressed publicly a clear intent to award the contract as a small business set-aside." AR 4.1-1408 (citing 13 C.F.R. §§ 124.504(a), (c)).  SKC also challenged SBA's use of prior-contract comparators to determine whether the procurement was a "new" requirement for logistics services, eliminating any need for SBA to examine whether awarding the logistics contract through the Section 8(a) Program had an adverse impact on SKC. *See* AR 4.1-1408 to -1409.

The contracting officer submitted a statement of facts to GAO in which he described the consultations between DIA and SBA and the events surrounding DIA's industry day presentation. *See* AR 4.5-1446.  The contracting officer also prepared and submitted to GAO a spreadsheet comparing the value of the Ikun contract to various comparators, including the value of the base contract with all option years and the Bridge Contract and posited that the proper comparator was the base contract. *See* AR 4.5-1446 to -1447.  In submissions to GAO, SBA reported that it "does not generally consider the value of a bridge contract when determining whether an offered procurement is a new requirement." AR 4.8-1469.  DIA also contended that the statements made at the industry days did not constitute "clear public expression[s] of intent to award the [logistics requirement] as a small business set-aside." AR 4.8-1468.

GAO considered the parties' competing interpretations of the implementing regulations of the Section 8(a) Program and concluded that "[w]hile [SKC's proffered reading] is one interpretation, [GAO] accept[s] as reasonable [SBA's] interpretation of its own regulation that the [B]ridge [C]ontract is a temporary solution and the new requirement analysis can be based on the full, 'long-term' contract which had previously been awarded for the services." AR 5.1-1523 & n.2.  Thus deferring to the SBA's proffered interpretation of the Section 8(a) regulations applicable in accepting the logistics contract into the Section 8(a) Program, GAO denied SKC's

---

[7]The Section 8(a) award to Ikun was formally made on June 5, 2017, though the logistics requirement was still included on the forecast documents given out at the industry day held on June 16, 2017.  The record is conflicting as to whether this was an oversight or if it reflected an intentional choice. *Compare* Hr'g Tr. 43:12-15, *with, e.g.,* AR 4.5-1446.

protest on November 20, 2017.  *See SKC, LLC*, B-415151 (Comp. Gen.), 2017 CPD ¶ 366, 2017 WL 5969281 (2017).  Following this denial, SKC filed the instant protest in this court.

## STANDARDS FOR DECISION

### A.    Standard of Review

This Court has jurisdiction under the Tucker Act "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or a proposed procurement."  28 U.S.C. § 1491(b)(1).  Section 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, governs the court's consideration of a challenge to an agency's contract award.  *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").  Under the APA, courts may set aside agency decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  The court accordingly can overturn an agency decision only "if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).

Because "[c]ontracting [o]fficers are entitled to exercise discretion upon a broad range of issues[,] . . . procurement decisions are subject to a highly deferential rational basis review."  *PAI Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010) (internal citations and quotation marks omitted); *see also Innovative Test Asset Sols., LLC v. United States*, 125 Fed. Cl. 201, 215 (2016) (noting that the arbitrary and capricious standard is highly deferential, and the court may not "substitute its judgment for that of the agency") (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)) (internal quotation marks omitted).  The question of whether the court would have applied the procurement regulations in a different manner than did the agency is irrelevant to this inquiry.  *See Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989).  Yet, deference to the agency's decision in a procurement is not required where "the agency has . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).  Indeed, the Supreme Court has cautioned that while "[t]he reviewing court should not attempt itself to make up for such deficiencies[, and it] may not supply a reasoned basis for the agency's action that the agency itself has not given[,] . . . [the court should] uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Id.* (internal quotations and citations omitted).

When reviewing an agency's interpretation of law, "[i]t is emphatically the province and duty of the [court] to say what the law is."  *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).  But where the agency is interpreting its own regulations and those regulations are ambiguous, the agency interpretation will control so long as it is not "plainly erroneous or inconsistent with the regulation."  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal

citations omitted).  The agency's interpretation must be expressed in a manner that "reflect[s] the agency's fair and considered judgment."  *See id*. at 462 (determining that a legal brief was a satisfactory vehicle for conveying the agency's fair and considered judgment).

## B.     The Section 8(a) Program

"In an effort to encourage small businesses, Congress has mandated that federal agencies restrict competition for some federal contracts."  *Kingdomware Techs., Inc. v. United States*, __ U.S. __, __, 136 S. Ct. 1969, 1973 (2016).  In Section 8(a) of the Small Business Act, Congress sought to "promote the business development of small business concerns owned and controlled by socially and economically disadvantaged individuals," 15 U.S.C. § 631(f)(2). [8]  Thus, the Section 8(a) Program operates as an exception to typical government procurement requirements that mandate "full and open competition" in the procurement processes.  *See* 48 C.F.R. § 6.302-5(a), (b)(4).

Where an agency seeks to secure procurement contracts from participants in the Section 8(a) Program, it must first submit an "offering letter" to the SBA containing, *inter alia*, information on the work to be performed, the value and length of performance, and "[t]he acquisition history, if any, of the requirement, including specifically whether the requirement is a follow-on requirement, and whether any portion of the contract was previously performed by a small business outside of the [Section] 8(a) . . . [P]rogram."  13 C.F.R. § 124.502(c).  The SBA then may "accept" the procurement proposal into the Section 8(a) Program for award to a program participant.  *See id*. § 124.503.  Certain circumstances limit the SBA's ability to accept a requirement into the Section 8(a) Program.  *See id*. § 124.504.  Relevant here, a procurement requirement may not be accepted into the Section 8(a) Program if, first, "[t]he procuring activity issued a solicitation for or otherwise expressed publicly a clear intent to award the contract as a small business set-aside . . . prior to offering the requirement to [SBA] for award as an 8(a) contract," or, second, if "SBA has made a written determination that acceptance of the procurement for 8(a) award would have an adverse impact on an individual small business."  *Id*. §§ 124.504(a), (c).  Adverse impact is presumed where the small business "has performed the specific requirement for at least 24 months," the small business "is performing the requirement at the time it is offered" for acceptance into the Section 8(a) Program, and "[t]he dollar value of the requirement that the small business is or was performing is 25 percent or more of its most recent annual gross sales."  *Id*. §§ 124.504(c)(1)(i)(A)-(C).  SBA is not required to consider whether a Section 8(a) procurement would have an adverse impact where the requirement is a "new" requirement as defined in the regulations.  *Id*. § 124.504(c)(1)(ii)(D); *see also Id*. § 124.504(c)(1)(ii)(C) ("The expansion or modification of an existing requirement will be considered a new requirement where the magnitude of change is significant enough to cause a price adjustment of at least 25 percent (adjusted for inflation) or to require significant additional

---

[8] The Section 8(a) Program was authorized by the Small Business Act, Pub. L. No. 85-536, § 8(a), 72 Stat. 384, 389 (codified at 15 U.S.C. §§ 631-57, 657a-57b, 657d-57f, 657i-57o, 657q-57s), *as amended by* the Small Business Administration Reauthorization and Amendments Act of 1990, Pub. L. No. 101-574, 104 Stat. 2814, and implemented via SBA regulations codified at 13 C.F.R. §§ 124.1 to 124.704.

or different types of capabilities or work.")

# ANALYSIS

The parties' briefing on their respective motions for judgment on the administrative record largely focuses on two aspects of the Section 8(a) Program's implementing regulations that might operate to bar awarding the logistics contract to Ikun.  First, SKC argues that DIA could not procure the logistics requirement through the Section 8(a) Program because it had previously "expressed publicly a clear intent to award the contract as a small business set-aside."  Pl.'s Mem. at 23 (citing 13 C.F.R. § 124.504(a)).  Additionally, SKC asserts that the procurement was improper because SBA failed to conduct an adverse impact analysis as required by the Section 8(a) Program regulations.  Pl.'s Mem. at 15 (citing 13 C.F.R. § 124.504(c)).  Each argument will be considered in turn.

## A.    Public Expression of Clear Intent Under 13 C.F.R. § 124.504(a)

SKC argues that DIA's statements regarding the logistics requirement at the industry days constituted public expressions of "'clear intent' to award the contract as a small business set-aside."  Pl.'s Mem. At 23 (citing 13 C.F.R. § 124.504(a)).  In support of this argument, SKC asserts that the forecast documents "reflected [DIA's] intent with regard to these acquisitions, *at least at the time the forecasts were distributed*," Pl.'s Mem. at 24 (emphasis in original), and the disclaimers made during the presentations and attached to the presentation documents, far from preventing the forecast documents from manifesting DIA's intent, "signaled to the public that, while [DIA's] plans for future acquisitions identified in the forecast reflected [DIA's] intent at the time the forecast was distributed, the plans weren't promises," *id.*  SKC also emphasizes the level of detail contained in the forecast documents, including "the period of performance of the contemplated contract, the incumbent for the logistics services work . . . the month and year [DIA] expected it would release the solicitation for the procurement[,] . . . the month and year [DIA] expected it would award the contract[, and]  . . . a point of contact for the acquisition."  *Id.* at 24-25.  Finally, SKC cites *Infiniti Information Solutions, LLC v. United States*, 92 Fed. Cl. 347 (2010), for the proposition that "[t]he [c]ourt, in[ ]fact has had occasion to address this very same issue . . . [and on that occasion] found that the forecasts [at issue there] clearly indicated that [a small business] classification was mandatory in order to receive the contract award."  Pl.'s Mem. at 25-26.

The government concedes that the forecast documents that were distributed at the February 14, 2017 and June 16, 2017 industry days listed the proposed logistics requirement as a small business set-aside, but argues that the disclaimers contained on the introductory slides of the February 14, 2017 presentation and given orally at the June 16, 2017 industry day dispositively foreclose the claim that the forecast constituted a public expression of clear intent. *See* Def.'s Cross-Mot. at 18-19; *see also* AR 2.1-1067, 1078, -1083, -1084, 2.2-1095, -1122. The government further emphasizes that the forecast documents contained information on "a multitude of potential procurements" rather than "a series of acquisition-specific activities that were targeted at a select list of vendors."  *Id.* at 20-21 (citing AR 2.1-1084 to 2.2-1130).  As to *Infiniti*, the government argues that SKC misreads that case, and that a proper reading of it does not support SKC's position here.  The government notes that *Infiniti* did not note any disclaimers

on the statements made there, that those statements were not made in a general pronouncement but rather were made to a select list of Section 8(a) Program participants for purposes of selecting one of them for a Section 8(a) procurement, and that the communications contained an express statement of intent to award the contract to a Section 8(a) Program participant that was also a Service-Disabled Veteran Owned business.  *Id.* at 19-21 (citing *Infiniti Information Solutions, LLC,* 92 Fed. Cl. at 351-359).  Finally, the government points to two decisions by GAO that it argues shows that "the GAO has routinely found [the Small Business Administration's] interpretation of the clear public intent requirement of 13 C.F.R. § 124.504(a) to require something more than a short, disclaimed reference, such as a publicly issued pre-solicitation notice or synopsis containing an unqualified intent to solicit the requirement as a set-aside."  Def.'s Cross-Mot. at 21 (citing *B&D Consulting, Inc.,* B-413310, 2016 WL 5869447 at *4 (Sept. 30, 2016); *AHNTECH, Inc.*, B-401092, 2009 WL 1099280 at *3 (Apr. 22, 2009)).

SKC's argument that DIA's industry day communications bar DIA from procuring the logistics requirement through the Section 8(a) Program is unavailing.  The case upon which SKC relies, *Infiniti*, does not supply the requisite support.  *Infiniti* dealt with agency statements that it would be procuring technology services under a procurement strategy it initially termed "Competitive 8(a) Set-Aside (Service Disabled/Veteran Owned)" and later revised to "8(a) Direct (Service Disabled/Veteran Owned)."  *Infiniti*, 92 Fed. Cl. at 351.  The documents were termed "forecasts" by the court, and took the form of notices that contained no apparent disclaimers.  *Id.*  The agency had responded to individual inquiries by noting that the "Service Disabled/Veteran Owned" language was merely a preference rather than a requirement, but this caveat was not made publicly.  *Id.*  The court held that awarding an Section 8(a) contract to a firm that was not "Service Disabled/Veteran Owned" was arbitrary and capricious, and the agency's private disclaimer was insufficient to save the agency's action because this caveat was not communicated publicly and thus the agency's communications publicly expressed a clear intent to award the contract to a firm that met both criteria.  *Id.* at 359.  To the extent that *Infiniti* is relevant to the circumstances of this case, given its differing procedural posture and factual history, it undermines SKC's assertions that an agency's invocation of a small business set-aside program operates inescapably to preclude acceptance into the Section 8(a) Program.  *Infiniti* emphasizes that the context of the pronouncement at issues matters, and a disclaimer that is not made publicly available to all parties cannot invalidate a facially clear expression of intent that is.

Here, DIA's communications regarding the logistics requirement were accompanied by disclaimers that conveyed the very lack of explicit intent to be bound by the specifics of the communication that the regulation instructs SBA to consider in determining whether to accept a contract into the Section 8(a) Program.  *See supra*, at 4-5.  Likewise, the court is mindful of the context of the regulation's language barring acceptance into the Section 8(a) Program of contracts that had previously been the subject of a public expression of clear intent.  Under the canon of *noscitur a sociis*, "an ambiguous term may be given more precise content by the neighboring words with which it is associated."  *Bilski v. Kappos,* 561 U.S. 593, 604 (2010) (citing *United States v. Stevens*, 559 U.S. 460, 474 (2010)).  The regulation bars from the Section 8(a) Program a contract for which "[t]he procuring activity *issued a solicitation for or otherwise expressed publicly a clear intent to* award the contract as a small business set-aside."  13 C.F.R. § 124.504(a) (emphasis added).  The regulation contemplates as barred a procurement for

which a statement of intent to reserve as a small business set-aside was sufficiently definite as to rise to the level of a recitation in an actual solicitation or some comparable statement of intent.

Although precedents interpreting and applying the prior intent requirement of 13 C.F.R. § 124.504(a) are sparse, the issue in this case is readily resolved based on the text of the regulation and the precepts followed in *Infiniti*. SKC has failed to produce evidence sufficient to establish as arbitrary and capricious SBA's conclusion that DIA's communications were not public expressions of clear intent sufficient to bar the logistics requirement from the Section 8(a) Program. This ground of SKC's protest is unavailing.

## B.  Adverse Impact Analysis Under 13 C.F.R. § 124.504(c)(ii)(C)

SKC's alternate ground for protest challenges DIA's and SBA's determination that the logistics requirement was a "new" requirement and thus no analysis of the potential adverse impact on SKC of the acceptance of the requirement into the Section 8(a) Program (an "adverse impact" analysis) was required. *See* Pl.'s Mem. at 14-23. The regulation states that a requirement is new if, in relevant part, an "expansion or modification of an *existing* requirement [results in a] magnitude of change . . . significant enough to cause a price adjustment of at least 25 percent (adjusted for inflation) or to require significant additional or different types of capabilities of work." 13 C.F.R. § 124.504(c)(1)(ii)(C) (emphasis added).

SKC argues that the plain meaning of the word "existing" in the Section 8(a) Program's implementing regulations requires that SBA compare, for purposes of determining if a planned procurement is a new requirement, the procurement "in existence or operation at the current time." Pl.'s Mem. at 18 (citing *Existing*, Oxford English Dictionary, available at https://en.oxforddictionaries.com/definition/existing (last visited Mar. 8, 2018)). Because DIA compared the Section 8(a) contract to the original 2011-2016 contract in concluding that the Section 8(a) contract varied by greater than 25 percent and was thus a new requirement, and because that contract was not "existing" at the time the Section 8(a) procurement was planned, SKC asserts that a proper comparison would show a less than 25 percent variance and thus the agency's failure to perform an adverse impact analysis mandates overturning the award of the logistics requirement through the Section 8(a) Program. *See* Pl.'s Mem. at 18.

SKC highlights inconsistencies and irregularities in the positions the agency has taken throughout the development of this procurement dispute. SKC notes that, in the initial offering letter DIA submitted to SBA, DIA referred to the Bridge Contract—SKC's proffered comparator—as the "existing" requirement for which the Section 8(a) contract was a follow-on requirement. *See* Pl.'s Mem. at 18-19 (citing AR 3.1-1171). SKC asserts that throughout the negotiations surrounding the initial offer letter DIA sent to SBA, the agency staff used language either directly referring to the Bridge Contract as the relevant comparator or implicitly assuming the Bridge Contract to be the existing requirement. Pl.'s Mem. at 19. Yet, while negotiations over the initial offering letter were ongoing, "[t]he contracting officer at that time appears to have stopped the email correspondence and instead says ['] can we have a conference call on this,['] and there is a conference call on May 31st . . . . There are no notes of that meeting. There's no other correspondence. . . . [And] there is this conference call, and then . . . there's an email saying please send us a new offering letter where you say it's a new requirement." Hr'g

Tr. 11:13 to 12:12.  SKC also points to the ambiguities regarding the rationale for the decision to treat the Section 8(a) contract as a new requirement, *see, e.g.*, Hr'g Tr.  at 14:8-16, and, in response to a question from the court asking "[w]as there any indication in those affidavits [that the government submitted to GAO] or in the agency report that the SBA was taking the interpretation of its regulations that it ultimately did[?]," counsel for SKC stated "Not in the affidavits. . . . [I]n the SBA['s] comments [to GAO], SBA states, literally in one sentence . . . 'SBA generally does not consider bridge contracts as part of a new requirement analysis,' period. No cite to anything.  No cite to . . . [a] policy paper, other cases . . . [and no] reference to the statute,"  Hr'g Tr. 14:21 to 15:17; *see also* AR 4.8-1469 (Letter from John Klein, Associate General Counsel for Procurement Law, Small Business Administration to Mary Curcio, Senior Attorney, GAO (Oct. 4, 2017)).

SKC additionally points to several GAO protests in which it asserts that the government has taken a position contradictory to that taken here.  Contrary to their current argument that bridge contracts are improper comparators for determining whether a proposed procurement is a new requirement, *see* Def.'s Cross-Mot. at 14-15, SKC asserts that GAO decisions addressed SBA's use of bridge contracts in determining whether a planned procurement was a new requirement.  *See* Pl.'s Mem. at 20-23 (citing *GOV Services, Inc.*, B-414374, 2017 CPD ¶ 143, 2017 WL 2131448 (May 11, 2017); *eAlliant, LLC*, B-407332.4, 2015 CPD ¶ 58, 2014 WL 7525701 (Dec. 23, 2014); *Azimuth, Inc.*, B-409711, 2014 CPD ¶ 218, 2014 WL 3695513 (July 21, 2014)); *HRCI-MPSC PASS, LLC*, B-408919, 2014 CPD ¶ 25, 2014 WL 116537 (Jan. 8, 2014); *NANA Servs., LLC*, B-297177.3, 2006 CPD ¶ 4, 2006 WL 133970 (Jan. 3, 2006)).

In short, SKC asserts that the position taken by the government is contrary to the plain language of the regulation, a *post hoc* rationalization, and contrary to the position taken in past bid protests.  For those reasons, it asserts that SBA's acceptance of DIA's logistics services requirement into the Section 8(a) Program and the Section 8(a) award to Ikun were arbitrary and capricious and should be set aside.

The government resists an interpretation of the word "existing" in 13 C.F.R. § 124.504(c)(1)(ii)(C) that "requires [SBA] to regard, as the . . . 'existing requirement,' any contract in[ ]place at the time the requirement is offered to SBA for inclusion in the 8(a) [P]rogram." Def.'s Cross-Mot. at 13 (citing Pl.'s Mem. at 15-23).  The government avers that such an interpretation "must fail because its interpretation does not track the regulatory language."  Def.'s Cross-Mot. at 13.  The government argues that "there is nothing in the regulation specifying that the 'existing requirement' is related to the time when 'an agency offers the requirement for the program.'" Def.'s Cross-Mot. at 14.  The government's position is that "the regulation says only 'existing requirement,' but it does not specify precisely when that requirement had to exist."  *Id.*

The government further contests SKC's characterization of the negotiations surrounding the acceptance of the logistics requirement into the Section 8(a) Program.  *See* Def.'s Cross-Mot. at 14-15.  The government characterizes those negotiations as resulting in the conclusion that the logistics requirement was a new requirement, and avers that the government's conclusion remained consistent throughout the development of this case.  *See id.* The government posits that its use of bridge contracts as comparators has been consistent, in that bridge contracts might

11

be employed as a comparator "if 'there is some basis to believe that the agency is altering the duration of the option periods to avoid particular regulatory requirements,'" *id.* at 15 (citing AR 4.18-1508), or where the procurement at issue, as in "the GAO cases, involve[d] bridge contracts . . . being challenged," Hr'g Tr. 34:14-20.

In short, the government argues that SKC reads into the regulation a temporal requirement where none exists, that it mischaracterizes the record as to the negotiations preceding the Section 8(a) award to Ikun, and that the government's position in this case is consistent with the positions taken in past cases, and is therefore not a *post hoc* rationalization.

The disposition of this case turns on whether and to what extent the agency's interpretation of its regulations concerning a new requirement is entitled to deference. In making this determination, the court looks to the Supreme Court's instructions in *Auer*, 519 U.S. 452. The Court there began with the precept that, as to an agency's interpretation of its own regulation, "interpretation of it is, under [Supreme Court] jurisprudence, controlling unless 'plainly erroneous or inconsistent with the regulation.'" *Id.* at 461 (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)).[9] *Auer* afforded deference to an agency's interpretation contained within a legal brief submitted in that litigation, noting that "[t]here is simply no reason to suspect that the interpretation does not reflect the agency's *fair and considered judgment on the matter in question*." *Auer*, 519 U.S. at 462 (emphasis added).

Argument at the hearing focused on the natural reading of the word "existing" in the Section 8(a) regulations, which normally would mean "in effect at the present time." *See* Hr'g Tr. 39:3-4. Under that reading, the Bridge Contract would be the proper comparator because performance under that contract was still in effect when SBA accepted the logistics requirement into the Section 8(a) Program. It was only after the lapse of the Bridge Contract and the filing of SKC's protest before the GAO that DIA awarded SKC a short-term bridge contract under which SKC is performing pending the outcome of these proceedings. *See* Hr'g Tr. 8:13-17. The court must therefore determine whether the government's proffered interpretation of the regulation is a fair and considered judgment and, if so, the agency's interpretation controls. *See Auer*, 519 U.S. at 462; *see also Reizenstein v. Shinseki*, 583 F.3d 1331, 1335 (Fed. Cir. 2009) ("The agency's

---

[9]As noted at the hearing, *see* Hr'g Tr. 30:4-14, a petition for certiorari currently pending before the Supreme Court presents the question whether *Auer*, and the case upon which it draws, *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410 (1945), should be overruled. *See* Petition for Writ of Certiorari, *Garco Constr., Inc. v. Secretary of the Army*, ___ U.S. ___ (No. 17-225). That petition has been relisted for conference by the Court on six consecutive occasions as of this writing, and is currently listed for conference on March 16, 2018.

In prior opinions, several justices have indicated a willingness to revisit *Auer. See, e.g. Perez v. Mortgage Bankers Ass'n*, ___U.S. ___, ___, 135 S. Ct. 1199, 1210-11 (2015) (Alito, J., concurring in part and concurring in the judgment); *Decker v. Northwest Env't Def. Ctr.*, 568 U.S. 597, 616 (2013) (Roberts, C.J., concurring); *Talk Am. Inc. v. Michigan Bell Tel. Co.*, 564 U.S. 50, 67-69 (2011) (Scalia, J., concurring); *id.* at 1213-25 (Thomas, J., concurring in the judgment).

construction of its own regulations is of controlling weight unless it is plainly erroneous or inconsistent with the regulation.") (internal quotations and alterations omitted).

At the hearing, the government argued that its refusal to employ the Bridge Contract as a comparator to the Section 8(a) procurement was "consistent with the approach the SBA has taken as to how [the new requirement] test works in other contexts . . . . [Even though the interpretation was not provided specifically until the GAO protest,] it[ is] fair to infer from the documents in the record . . . that its position must be consistent across that time, because if it was inconsistent, SBA would have had a different conclusion." Hr'g Tr. 34:15 to 36:24; *see also* Def.'s Cross-Mot. at 15 (SBA "also explained that it might consider a temporary bridge contract to be the proper comparator . . . if 'there is some basis to believe that the agency is altering the duration of the option periods to avoid particular regulatory requirements.'"). This reading would add a further gloss on the government's stated approach to determining whether to use a bridge contract as the comparator. SKC points to *Azimuth*, in particular, noting that although the requirement at issue there was considered new regardless of comparator used, the decision nevertheless "demonstrates that the SBA does *not* exclude the value of bridge contracts in making the[se] comparison[s]." Pl.'s Mem. at 22 (emphasis in original). The government rebuts this assertion by emphasizing that the protestor in *Azimuth* lost regardless of which comparator was used. *See* Def.'s Cross-Mot. at 16 (citing *Azimuth*, 2014 WL 3695513 at *5).

The record in this case paints a concerning picture of the agency's deliberative process as it relates to determining whether an adverse impact analysis was required before the logistics requirement at issue here could be accepted into the Section 8(a) Program. As the parties acknowledged, *see* Hr'g Tr. 15:10-19, 36:9-24, the first articulation in this procurement of the agency's interpretation of the regulation as it pertains to using bridge contracts as comparators came in SBA's comments to the GAO. Moreover, in the circumstances surrounding the May 31, 2017 conference call, it is difficult to accept the government's hypothesis that "it was concluded that the correct 'existing requirement' was SKC's 2011 contract, not its [B]ridge [C]ontract." Def.'s Cross-Mot. at 15 (citing AR 4.12-1490 to 4.16-1496. As counsel for SKC noted, there are no contemporaneous records of the conference call or what was discussed. Hr'g Tr. 11:4 to 14:13. Overall, information regarding the agency personnel's contemporaneous deliberation is entirely *post hoc* in nature, and the administrative record gives minimal, if any, details regarding the deliberative process agency personnel employed at the time that decision was actually made in reaching the conclusion that no adverse impact analysis was required. Rather, the most comprehensive interpretation of the government's deliberative process comes from the government's briefing and oral argument before this court.

The shortcomings in the administrative record notwithstanding, the Supreme Court's instructions in *Auer* are explicit: an agency's interpretation of its own regulations—even, as in *Auer* itself, interpretations articulated for the first time in *post hoc* argument in legal briefs—are entitled to controlling weight unless the court can conclude that it is "plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461. Here, as in *Auer*, the agency interpretation is attacked as being "a '*post hoc* rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack." *Id.* at 462 (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988)) (alteration in original). Nonetheless, SKC has failed to show any "reason to suspect that the interpretation does not reflect the agency's fair and considered

judgment" on when and whether to employ bridge contracts in determining if a Section 8(a) procurement is a new requirement.  *See Auer* 519 U.S. at 462.  The agency's decision is of "less than ideal clarity," but its path "may reasonably be discerned."  *See State Farm*, 463 U.S. at 43 (internal quotations and citations omitted).

The court has considered the evidence in the administrative record, the arguments by the parties, and the cases the parties discuss, and on this record the court cannot conclude that the government's proffered interpretation of 13 C.F.R. § 124.504(c)(1)(ii)(C)  is plainly erroneous or inconsistent with the regulation.  SKC's second ground of protest is denied.

## CONCLUSION

For the reasons stated, the government's cross-motion for judgment on the administrative record is GRANTED, and SKC's motion for judgment on the administrative record is DENIED. The clerk is directed to enter judgment in accord with this disposition.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge